# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**BRIAN BERRY, JERMARIO ANDERSON, REGINALD TRAMMON and EDWYN DURANT,**

        **Plaintiffs,**

**v.**　　　　　　　　　　　　　　　　　**Case No:  6:11-cv-1740-Orl-36KRS**

**JERRY DEMINGS, TRAVIS LESLIE, KEITH VIDLER, DAVE OGDEN, JOHN DOES 1 - 10,**

        **Defendants.**

_____

## ORDER

This cause comes before the Court on four motions for summary judgment on Plaintiffs Brian Berry, Jermario Anderson, Reginald Trammon, and Edwyn Durant's ("Plaintiffs") Amended Complaint:  (1) Defendant Dave Ogden's ("Defendant Ogden") Motion for Summary Judgment (Doc. 93); (2) Defendant Keith Vidler's ("Defendant Vidler") Motion for Summary Judgment (Doc. 94); (3) Defendant Travis Leslie's ("Defendant Leslie") Motion for Summary Judgment (Doc. 95); and (4) Defendant Jerry Demings' ("Defendant Demings") Motion for Summary Judgment (Doc. 96).[1]  Plaintiffs filed responses in opposition to each Motion for Summary Judgment (Docs. 98–101), and Defendants replied in further support of their Motions (Docs. 104–107).  Having determined that oral argument is unnecessary, this matter is ripe for review.  Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, the

---

[1] Defendants Ogden, Vidler, Leslie, and Demings are collectively referred to as "Defendants." Defendants' Motions for Summary Judgment are collectively referred to as the "Motions for Summary Judgment."

Court will grant the motions of Defendants Ogden and Demings.  The motions of Defendants Vidler and Leslie will be granted in part and denied in part.

## I.   BACKGROUND

### A.   Statement of Facts[2]

#### 1.   *Strictly Skillz Barbershop*

This case arises from an unannounced, warrantless inspection of Strictly Skillz Barber & Salon ("Strictly Skillz"), a barbershop located near the Pine Hills neighborhood in Orlando, Florida, conducted by officers of the Orange County Sherriff's Office ("OCSO") and representatives from the Florida Department of Business and Professional Regulation ("DBPR") on August 21, 2010.  *See* Doc. 87, ¶¶ 8, 35.  According to a post-operation report prepared by the DBPR, the inspection of Strictly Skillz was part of a larger "sweep operation" of nine barbershops and cosmetology salons in the Pine Hills area conducted on the same date.  Doc. 98-6 (the "DBPR Report"), pp. 21–22.  Plaintiff Brian Berry ("Plaintiff Berry"), an African-American male, is the sole owner of Strictly Skillz.  Doc. 93-2, Deposition of Brian Berry ("Berry Dep."), pp. 12–13; Doc. 139, ¶ 3.  Plaintiff Berry is a licensed barber and has been operating Strictly Skillz since 2007.  Berry Dep., pp. 10, 12–13.  Plaintiffs Edwyn Durant ("Plaintiff Durant"), Reginald Trammon ("Plaintiff Trammon"), and Jermario Anderson ("Plaintiff Anderson") are African-American males who have worked as licensed barbers at Strictly Skillz since 2007.  *Id.* at 12–13; Doc. 93-3, Deposition of Jermario Anderson ("Anderson Dep."), pp. 9, 12; Doc. 93-4, Deposition of Edwyn Durant ("Durant Dep."), pp. 11, 14; Doc. 93-

---

[2] This Statement of Facts is derived primarily from the parties' Joint Stipulation of Agreed Material Facts (Doc. 139), the deposition testimony of Plaintiffs, the affidavits of Defendants Ogden, Vidler, and Leslie, and a report prepared by the Florida Department of Business and Professional Regulation.  The testimony of the parties differs with respect to several aspects of this incident.  However, at this stage, the Court is obliged to construe the facts in the light most favorable to Plaintiffs.  See *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

5, Deposition of Reginald Trammon ("Trammon Dep."), pp. 8, 10; Doc. 139, ¶¶ 4–7. Plaintiffs Durant, Trammon, and Anderson each rent a barbering chair in Strictly Skillz from Plaintiff Berry for a weekly fee, and they retain the proceeds they receive from their customers. Berry Dep., p. 14.

### 2. The Planning of the Sweep Operation

The impetus for the sweep operation was a chance encounter at the Pine Hills Shopping Center between Defendant Vidler, a corporal with OCSO who was working an off-duty assignment, and Amanda Fields ("Inspector Fields"), an inspector with the DBPR who was conducting an inspection of a barbershop. *See* DBPR Report, p. 15. DBPR inspectors are tasked with conducting inspections of barbershops and cosmetology salons to ensure compliance with barbershop laws and regulations. *Id*. During her conversation with Defendant Vidler, Inspector Fields described difficulties and resistance she had encountered while conducting inspections. *Id*. She expressed safety concerns and described evidence of criminal activity she had witnessed involving weapons and narcotics. *Id*. Because DBPR is not empowered by the legislature to take law enforcement action, DBPR relies on local law enforcement to enforce violations of state law. *Id*. Defendant Vidler agreed to accompany Inspector Fields in an inspection at the Pine Hills Shopping Center, which resulted in the issuance of citations. *Id*. Afterward, Defendant Vidler conducted research on Fla. Stat. § 476.194, which provides that barbering without an active license is a second-degree misdemeanor.[3] *Id*. at 16. Over the next two months, he

---

[3] Fla. Stat. § 476.194 provides:

    (1) It is unlawful for any person to:

    (a) Engage in the practice of barbering without an active license as a barber issued pursuant to the provisions of this act by the department.

remained in communication with Inspector Fields regarding the potential for joint operations between DBPR and OCSO, and expressed his desire to assist DBPR inspectors in barbershop inspections. *Id.*

On August 5, 2010, OCSO officers met with representatives of the DBPR Division of Regulation to discuss illegal activities taking place in local barbershops and cosmetology salons in the Pine Hills area, including violent shootouts, gambling, and narcotics sales and consumption. *Id.* at 17. The DBPR representatives explained the difficulties they encountered in their inspections, given their inability to take law enforcement action. *Id.* At the meeting, OCSO officers and DBPR representatives made initial plans for a joint "sweep operation" on August 21, 2010, to visit certain barbershops, which had previously resisted, failed to cooperate with, threatened, or assaulted DBPR inspectors. *Id.* at 17–20. Strictly Skillz was included in the list of barbershops to be inspected because Olvie Demosthene, an inspector with the DBPR ("Inspector Demosthene"), had conducted two inspections in 2007 in which Strictly Skillz barbers were

---

(b) Hire or employ any person to engage in the practice of barbering unless such person holds a valid license as a barber.

…

(d) Own, operate, maintain, open, establish, conduct, or have charge of, either alone or with another person or persons, a barbershop:

1. Which is not licensed under the provisions of this chapter; or

2. In which a person not licensed as a barber is permitted to perform services.

(e) Use or attempt to use a license to practice barbering when said license is suspended or revoked.

(2) Any person who violates any provision of this section is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

observed operating without a barbering license and they refused to produce their licenses.  *Id.* at 18–19.

Upon learning about the problems faced by DBPR inspectors, Defendant Ogden—a captain with OCSO—tasked his staff with researching the issues, legal precedents, and OCSO policies and procedures.  *Id.* at 20.  Defendant Ogden's staff contacted representatives of the State Attorney's Office ("SAO") to ensure that SAO would cooperate with any prosecutions resulting from the sweep operation.  *Id.*  The operation was also discussed with the Legal Section of OCSO prior to implementation.  *Id.*  Based upon these discussions, OCSO and DBPR decided that they had a sufficient basis to proceed with the sweep operation.  *Id.*

After the August 5, 2010 meeting, OCSO and DBPR representatives continued to communicate with regard to the sweep.  *Id.* at 20–21.  On August 19, 2010—two days before the sweep operation—DBPR inspectors conducted walkthroughs of approximately six barbershops, including Strictly Skillz, in preparation for the sweep.  *Id.* at 21; Berry Dep. pp. 60–61.  The inspectors gathered intelligence on the number of exits, people, and barbering stations at the barbershops.  DBPR Report, p. 21.

Defendant Vidler prepared an "Operations Plan" for the sweep.  *Id.* at 23; Doc. 139; ¶ 1. The Operations Plan provided for two teams to visit the various barbershops in the Pine Hills area that were the subjects of the sweep.  DBPR Report, p. 24.  Each team would consist of one supervisor, one narcotics agent, one plain clothes deputy, three uniformed deputies and 2 DBPR agents.  *Id.*  The plain clothes deputy was to enter the barbershop first, for "visual aid only" and to conduct "passive surveillance."  *Id.*  The DBPR agents would then enter and attempt to identify unlicensed barbers.  *Id.*  Once DBPR identified an unlicensed barber, OCSO deputies would arrest the individual for violating Fla. Stat. § 476.194.  *Id.*  In addition, the teams were

prepared to handle contraband, gather intelligence, and interview possible confidential informants. *Id.*

3.      *The Inspection of Strictly Skillz*

On August 21, 2010, seven DBPR employees and 14 OCSO officers conducted the sweep of nine barbershops in the Pine Hills area, including Strictly Skillz.  *Id.* at 21–22. Defendant Vidler, Defendant Leslie (an OCSO deputy), Inspector Fields, and at least five other OCSO officers were present during the inspection of Strictly Skillz.  Doc. 98-2, pp. 5–7.  OCSO officers did not obtain a search warrant prior to arriving at Strictly Skillz.  Doc. 94-1, Affidavit of Keith Vidler ("Vidler Aff."), ¶ 6.  Five or six barbers were on duty at the time the officers first arrived, and there were ten to 25 customers in the store.  Berry Dep., pp. 69, 115; Anderson Dep., pp. 46, 55; Durant Dep., pp. 54–55; Trammon Dep., p. 59.

Plaintiff Anderson was cutting a customer's hair when he noticed a "whole bunch" of police cars pull into the parking lot and a "whole bunch" of OCSO officers "rush in."[4]  Anderson Dep., p. 48.  Some of the officers were wearing masks and bulletproof vests and had their guns drawn.  *Id.* at 49–52; Durant Dep., pp. 56, 64–65, 68; Trammon Dep., p. 85.  Inspector Fields also entered with the OCSO officers.  Anderson Dep., p. 52; Durant Dep. p. 59; Trammon Dep., p. 61.  Plaintiff Trammon was on the phone and had a customer in his chair when eight to ten officers walked in the door and told him to hang up the phone and put his hands behind his back.[5]  Trammon Dep., pp. 60–62.  His hands were then immediately placed in plastic "zip ties" by two female officers.  *Id.* at 63–64.  Plaintiff Durant had just finished with a customer and was walking behind the customer to the front of the store when officers "rushed in like the SWAT

---

[4] Two plain clothes officers had entered the store just minutes before the rest of the officers arrived.  Vidler Aff., ¶ 10; Berry Dep., p. 76; Trammon Dep., p. 67.

[5] Defendant Vidler testified that, upon entering Strictly Skillz, he requested that Plaintiff Trammon "be detained for investigation."  Vidler Aff., ¶ 11.

6

team." Durant Dep., pp. 53, 56.  One officer immediately asked Plaintiff Durant if he worked in the store, and when Plaintiff Durant responded affirmatively, the officer instructed him to "sit down and shut up," and Plaintiff Durant sat down in a chair.  *Id.* at 56–58.  The officer "scream[ed]" for everybody to get out and that the shop was "closed down indefinitely."  *Id.* at 57–58.  The officers forced all customers, with the exception of one, to leave the shop.  Berry Dep., p. 70; Anderson Dep., p. 55; Durant Dep. p. 58; Trammon Dep., p. 65.  Officers blocked off the parking lot of the shopping center, so that cars and individuals could not exit or enter. Durant Dep., pp. 37–38, 71, 102–03.

The officers asked Plaintiffs Anderson and Durant to present their driver's licenses. Anderson Dep., pp. 53–54; Durant Dep. pp. 58–59.  Inspector Fields then asked Plaintiff Anderson to present his barbering license, and he retrieved his license from the wall at his barbering station.  Anderson Dep., p. 54.  After Plaintiff Anderson's customer was forced out of the shop, a "short" officer wearing a mask instructed Plaintiff Anderson to put his hands behind his back, and his hands were then placed in plastic "zip ties" by the officer.  *Id.* at 56–59. Plaintiff Trammon informed the two female officers who had placed him in handcuffs that he had a firearm concealed in his pants.  Berry Dep., p. 81; Trammon Dep., pp. 79–81.  Plaintiff Trammon also told the officers that he had a concealed weapons permit, which he presented to them.  Berry Dep., p. 81; Trammon Dep., p. 81.

Around the time that the officers were first entering Strictly Skillz, Plaintiff Berry was behind the shop.  Berry Dep., pp. 62–65.  Officers approached him and he identified himself as the owner.  *Id.* at 66.  The officers radioed in on their walkie talkies that the owner was coming in, and they followed him into the shop through the back door.  *Id.* at 63, 66.  As he entered the shop from the back door, he immediately saw Plaintiffs Anderson and Trammon already in

handcuffs and being patted down by officers.  *Id.* at 67, 80–81.  As Plaintiff Berry walked to the front of the shop and identified himself as the owner, a "young" male officer in a green uniform placed him in metal handcuffs.[6]  *Id.* at 71, 74.  Plaintiff Berry was verbally irate and used profanity as he was being handcuffed, but he did not physically resist.  *Id.* at 75, 83–84.  A female officer took Plaintiff Berry's driver's license, and he was patted down.[7]  *Id.* at 73, 80.

While Plaintiffs Berry, Anderson, and Trammon were handcuffed, Inspector Fields, together with OCSO officers, conducted an inspection of the shop.  Berry Dep., pp. 73, 79, 82–83, 88, 90–94; Anderson Dep., p. 65; Durant Dep., pp. 61, 63; Trammon Dep., p. 77.  OCSO officers called in the barbers' driver's license information to check if they had any outstanding arrest warrants.  Berry Dep., p. 73; Anderson Dep., p. 63; Durant Dep., p. 59.  Meanwhile, Inspector Fields retrieved the barbers' licenses and called in to DBPR to check if their licenses were valid.  Berry Dep., p. 79; Anderson Dep., p. 63; Durant Dep., p. 59.  OCSO officers proceeded to open and search through the drawers at each of Plaintiff Berry, Anderson, Durant, and Trammon's barbering stations.  Berry Dep., pp. 73, 90–92; Anderson Dep., p. 65; Durant Dep., pp. 59, 61; Trammon Dep., pp. 77, 79.  Inspector Fields inspected the barbering stations and looked into the drawers as the officers opened them.  Berry Dep., pp. 82, 90, 93; Anderson Dep., pp. 65, 66; Durant Dep., p. 63; Trammon Dep., pp. 77, 79.  The manner in which Inspector Fields inspected the drawers and barbering stations was consistent with inspections that DBPR representatives had done in the past.  Berry Dep., p. 88; Anderson Dep., p. 66; Durant Dep., p. 62.  However, during previous inspections of Strictly Skillz, DBPR inspectors had never been accompanied by OCSO officers.  Berry Dep., p. 54; Durant Dep., p. 40.  The OCSO officers also

---

[6] Defendant Leslie has admitted that he placed Plaintiff Berry in handcuffs.  Doc. 94-3, Affidavit of Travis Leslie ("Leslie Aff."), ¶ 6.

[7] Defendant Leslie has admitted that he patted down Plaintiff Berry.  Leslie Aff., ¶ 6.

went to the back of the shop, without Inspector Fields, and opened an unlocked door to a storage room, which they inspected. Berry Dep., pp. 88, 89, 93, 94, 100; Anderson Dep., pp. 67–68; Durant Dep., pp. 97–98; Trammon Dep., p. 78.

After concluding her inspection, Inspector Fields determined that all barbers performing services were licensed and that the shop was in compliance with all safety and sanitation rules. DBPR Report, p. 29. At that point, Plaintiffs Berry, Anderson, and Trammon were released from their handcuffs. Anderson Dep., pp. 63–64. They had been handcuffed for approximately 15 to 45 minutes. Berry Dep., p. 78; Anderson Dep., p. 61; Trammon Dep., p. 76. Officers did not take any persons present at Strictly Skillz into custody. DBPR Report, p. 29; Berry Dep., p. 109. Inspector Fields and the officers were in the shop for a total of approximately 30 minutes to an hour. Berry Dep., p. 85; Anderson Dep., p. 64; Durant Dep., p. 70; Trammon Dep., pp. 76–77. After Inspector Fields and the officers left, Strictly Skillz resumed operations. Berry Dep., p. 86.

### B.      Procedural History

On October 9, 2012, following the Court's dismissal of certain Counts in Plaintiffs' original Complaint (*see* Docs. 85, 86), Plaintiffs filed an Amended Complaint (Doc. 87), asserting the following Counts:  (1) Count One – a claim under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment (all Defendants in their individual capacities); (2) Count Two – a claim under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment (Defendants Demings and Ogden in their official capacities); (3) Count Three – a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment (all Defendants in their individual capacities); (4) Count Four – a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment (Defendants Demings and Ogden in their official capacities); (5) Count Five – violation of the Florida Constitution, art. I, § 12 (Defendant Demings in his official capacity and Defendants Ogden,

Leslie, and Vidler in their individual capacities); (6) Count Six – violation of the Florida Constitution, art. I, § 23 (Defendant Demings in his official capacity and Defendants Ogden, Leslie, and Vidler in their individual capacities); (7) Count Seven – false imprisonment (Defendant Demings in his official capacity and Defendant Leslie in his individual capacity); (8) Count Eight – battery (Defendant Demings in his official capacity and Defendant Leslie in his individual capacity); (9) Count Nine – declaratory relief;[8] and (10) Count Ten – injunctive relief (Defendant Demings in his official capacity).  Doc. 87.

On October 22, 2012, Defendant Demings filed a motion to dismiss the Amended Complaint, and the next day, the remaining Defendants each filed a motion to dismiss.  *See* Docs. 88–91.  Thereafter, on November 9, 2012, each Defendant filed a Motion for Summary Judgment.  *See* Docs. 93–96.

On April 29, 2013, in response to the motions to dismiss, the Court entered an Order dismissing:  (1) Counts One, Three, Five, and Six against Defendant Demings; (2) Counts Five, Six, and Nine against Defendant Vidler; (3) Counts Five, Six, Seven, Eight, and Nine against Defendant Leslie; and (4) Counts Two, Three, Four, Five, Six, and Nine against Defendant Ogden.  *See* Doc. 122.  Accordingly, those Counts are not addressed in this Order.

Defendant Ogden seeks summary judgment on the sole Count remaining against him, Count One.  *See* Doc. 93.  Defendants Vidler and Leslie seek summary judgment on the sole

---

[8] The Amended Complaint does not clearly indicate which Defendants are implicated in Plaintiffs' claim for declaratory relief.  At the hearing on Defendants' motions to dismiss, however, Plaintiffs clarified that they are pursuing declaratory relief solely against Defendant Demings in his official capacity.  *See* Doc. 118.

Counts remaining against them, Counts One and Three.  *See* Docs. 94, 95.  Defendant Demings

seeks summary judgment on Counts Two, Four, and Ten.  *See* Doc. 96.[9]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when the court is satisfied that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"

after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits.

*See* Fed. R. Civ. P. 56(a).  Issues of fact are genuine only if "a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

fact is "material" if it may affect the outcome of the suit under governing law.  *Id.*

In deciding a motion for summary judgment based on qualified immunity, the Court must

resolve all issues of material fact in favor of the plaintiff.  *See Lee v. Ferraro*, 284 F.3d 1188,

1190 (11th Cir. 2002).  The facts are viewed in the light most favorable to the plaintiff because

the legal issue of qualified immunity on summary judgment is "'not which facts the parties might

be able to prove, but, rather, whether or not certain given facts showed a violation of clearly

established law.'"   *Id.* (quoting *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998)).

Although the "facts, as accepted at the summary judgment stage of the proceedings, may not be

the actual facts of the case[,]" for summary judgment purposes, all reasonable inferences from

the facts are to be drawn in favor of the plaintiff.  *Id.* (quoting *Priester v. City of Riviera Beach*,

208 F.3d 919, 925 n.3 (11th Cir. 2000)); *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

"Summary judgment is appropriate if 'the evidence before the court shows that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[9] Defendant Demings did not request summary judgment on Counts Seven, Eight, or Nine.  *See* Doc. 96.

matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.1995)).

## III.    DISCUSSION

### A.    Claims Against Defendants Ogden, Vidler, and Leslie

Counts One and Three of the Amended Complaint assert claims under 42 U.S.C. § 1983 for alleged violations of Plaintiffs' constitutional rights under the Fourteenth and Fourth Amendments, respectively. *See* Doc. 87, pp. 14, 19. Defendants Ogden, Vidler, and Leslie argue that they are entitled to qualified immunity on these claims. *See* Doc. 93, pp. 10–15; Doc. 94, pp. 9–17; Doc. 95, pp. 10–18.

With regard to § 1983 claims, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities when acting within their discretionary authority if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or harassive litigation[.]" *McCullough*, 559 F.3d at 1205 (citing *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987)).

To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were: "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Gray ex. rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006) (internal citations and quotations omitted). Here, it is undisputed that Defendants Ogden, Vidler, and Leslie were OCSO law enforcement officers acting within the course and scope of their duties. Doc. 120, p. 4.

Once it is established that a defendant was acting within the course and scope of his duties, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *McCullough,* 559 F.3d at 1205. To do so, the plaintiff must satisfy the two-prong test articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, the Court asks whether, viewed in the light most favorable to the plaintiff, the evidence shows that the officer violated plaintiff's constitutional rights. *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2009). Second, if such a violation occurred, then the Court must determine "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Davis v. Williams*, 451 F.3d 759, 762 (11th Cir. 2006) (internal citations and quotations omitted). Specifically, to defeat summary judgment, a plaintiff facing a defendant's alleged qualified immunity must produce evidence of a factual dispute raising a genuine issue of fact material to the determination of the underlying issue—here, whether the inspection of Strictly Skillz violated Plaintiffs' rights under the Fourth Amendment or the Equal Protection Clause of the Fourteenth Amendment. *McCullough*, 559 F.3d at 1205; *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

### 1.    *Equal Protection Claim*

Count One alleges that Defendants Ogden, Vidler, and Leslie violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment by "selecting Plaintiffs' business for search and inspection on the basis of Plaintiffs' race and the race of the owners, employees, and/or clientele at Plaintiffs' business." Doc. 87, ¶¶ 64–65. To prevail on a claim under the Equal Protection Clause, a plaintiff must show that: (1) he was treated differently from similarly situated persons; and (2) the defendant unequally applied the laws for the purpose of discriminating against him. *Morris v. City of Orlando*, No. 6:10-cv-233, 2010 WL 4646704, at *7 (M.D. Fla. Nov. 9, 2010) (citing *GJR Inv., Inc. v. County of Escambia, Florida*, 132 F.3d

1359, 1367 (11th Cir. 1998)).  The similarly situated persons must be "prima facie identical [to plaintiffs] in all relevant respects."  *Id.* (citing *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006)).  Moreover, the Equal Protection Clause prohibits only *intentional* discrimination.  *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008).

Here, Plaintiffs have failed to point to any evidence that they were treated differently from similarly situated persons, or that Defendants Ogden, Vidler, and Leslie intended to discriminate against them.  Plaintiffs' responses to the Motions for Summary Judgment filed by those Defendants each contain the identical, conclusory statement that "Plaintiffs were treated differently than similarly situated businesses in the same vicinity, providing the same services, and owned by Caucasians that were not targeted by [the Defendants]."  *See* Doc. 99, p. 14; Doc. 100, p. 13; Doc. 101, p. 12.  Each response also contains the conclusory allegation that Defendants "deliberately and unjustifiably" targeted Plaintiffs "based on race in violation of the Equal Protection Clause."  *See* Doc. 99, p. 14; Doc. 100, p. 13; Doc. 101, p. 12.  However, Plaintiffs have not cited any evidence in support of these allegations.  "[C]onclusory allegations without specific supporting facts have no probative value" in opposing a motion for summary judgment.  *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).  Rather, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986) (internal quotations omitted).  Plaintiffs have not met their burden, failing to point to any evidence in the record which would support an Equal Protection claim.  Accordingly, the Court must dismiss Count One against Defendants Ogden, Vidler, and Leslie.

As Count One is the only claim remaining against Defendant Ogden, he will be terminated as a party to this case.

2.      *Fourth Amendment Claim*

Count Three alleges that Defendants Vidler and Leslie violated Plaintiffs' rights under the Fourth Amendment by subjecting Plaintiffs to an unreasonable search and seizure.  Doc. 87, ¶ 90.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting U.S. Const. amend. IV).  "[T]he Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes.  An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable[.]"  *New York v. Burger*, 482 U.S. 691, 699 (1987).  The Supreme Court has explained the applicability of the Fourth Amendment in the context of administrative searches as follows:

> This expectation [of privacy] exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes.  An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home.  This expectation is particularly attenuated in commercial property employed in "closely regulated" industries. . . .  Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context.  Rather, we conclude that, as in other situations of "special need," where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.

*Id.* at 699–700, 702 (internal citations omitted).

*a.      The regulatory framework for barbershop inspections in Florida*

In view of the foregoing principles, the Supreme Court has fashioned a three-part test for determining whether a statutory or regulatory scheme authorizing administrative inspections of closely regulated businesses is constitutionally permissible:  (1) the State must have a substantial interest in regulating the particular business; (2) the inspection must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in view of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Bruce v. Beary*, 498 F.3d 1232, 1239 (11th Cir. 2007) (citing *Burger*, 482 U.S. at 702–03).

Plaintiffs do not dispute that barbershops in Florida are "closely regulated" businesses and, therefore, the Court will assume this to be true.[10]  The regulatory framework governing barbershop inspections in Florida is Fla. Stat. § 476.184 and its implementing rules.  Section 476.184 authorizes the Barbers' Board, a subdivision of the DBPR, to adopt rules governing the operation and "periodic inspection" of licensed barbershops.  The Barbers' Board has promulgated a rule under Section 476.184 providing that, in relevant part:  "Inspections conducted by the [DBPR] of barbershops to determine whether such barbershops are in compliance with the applicable provisions of Chapter 476, F.S., and the rules promulgated thereunder shall be conducted biennially, effective July 1, 2010, on a random unannounced basis, unless otherwise practicable."  Fla. Admin. Code. Ann. R. 61G3-19.015 (2010).  Plaintiffs do not contend that this regulatory framework violates the Fourth Amendment and, accordingly, the Court will assume that the statute and rules authorizing administrative searches of barbershops are constitutionally permissible.  *See Bruce*, 498 F.3d at 1239 (assuming that a Florida statute

---

[10]  Indeed, the regulatory scheme governing barbershops in Florida is similar to those in other states where courts have recognized that barbershops are "closely regulated" businesses.  *See, e.g.*, *Gordon v. City of Moreno Valley*, 687 F. Supp. 2d 930, 949 (C.D. Cal. 2009); *Stogner v. Commonwealth of Kentucky*, 638 F. Supp. 1, 3 (W.D. Ky. 1985).

authorizing administrative inspections of automobile body repair and salvage shops is constitutionally permissible under the three-part *Burger* test where the plaintiff did not challenge the statute).

> b. *OCSO and DBPR representatives were constitutionally permitted to conduct an administrative search*

Even where the statute authorizing administrative searches is constitutional, "[t]he administrative search exception does not confer authority on law enforcement to ignore the requirement for a warrant where 'the *primary purpose* [of the search or seizure] was to detect evidence of ordinary criminal wrongdoing.'" *Id.* at 1239 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)) (emphasis added). For example, "in *Burger*, the [Supreme] Court rejected the idea that an administrative inspection may be used to gather evidence as part of what is, in reality, a criminal investigation." *Id.* (citing *Burger*, 482 U.S. at 716 n.27). Nevertheless, "[t]he Supreme Court has made quite clear that an administrative search is not rendered invalid because it is accompanied by *some suspicion* of wrongdoing." *Id.* at 1242. Thus, the Eleventh Circuit has approved administrative searches in response to information giving rise to *some suspicion* of illegal activity. *See id.*; *Crosby v. Paulk*, 187 F.3d 1339, 1348 (11th Cir. 1999).

In *Bruce*, OCSO officers received a complaint that plaintiff Bruce's automotive body repair shop had sold a car which did not have matching vehicle identification number ("VIN") plates and stickers. 498 F.3d at 1235–36. As a result, the officers conducted a warrantless administrative inspection of the shop pursuant to Fla. Stat. § 812.055, which permits law enforcement officers to perform a warrantless physical inspection of salvage yards and repair shops "for the purpose of locating stolen vehicles . . .; investigating the titling and registration of vehicles . . .; inspecting vehicles . . . wrecked or dismantled; or inspecting records required [to be

kept by such businesses]." *Id.* at 1236 (quoting Fla. Stat. § 812.055).  During the search, the

officers seized much of the property on the premises and arrested Bruce for possession of loose

VIN plates and for operating a "chop shop."  *Id.* at 1237–38.  Bruce filed an action under 42

U.S.C. § 1983 against the sheriff and the officers, asserting that the administrative inspection of

his shop constituted an unreasonable search and seizure and, therefore, violated the Fourth

Amendment.  *Id.* at 1239.  On appeal, the Eleventh Circuit held that the Fourth Amendment did

not prohibit the officers from conducting an administrative inspection even though they had

some suspicion that Bruce had committed a crime.  *Id.* at 1242.  The Court explained:

> [I]n this case, the officers did not have "direct criminal suspicion" of wrongdoing.
> They received a criminal complaint regarding possible VIN violations at Bruce's
> auto body shop.  This information alone did not rise to the level of probable cause
> that would have supported application for a warrant.  In the absence of such direct
> criminal suspicion, the officers validly invoked their statutory authority to inspect
> Bruce's Premises to determine whether he was operating in accordance with
> Florida law governing use of VIN plates.  Merely because the officers had "an
> objectively reasonable basis to suspect they might find stolen cars or car parts in
> their inspection does not invalidate that inspection."  Therefore, we hold that
> defendants were permitted to conduct a warrantless administrative inspection of
> Bruce's Premises for the purpose of investigating VIN violations.

*Id.* (internal citations omitted).

Similarly here, OCSO and DBPR representatives did not have "direct criminal suspicion"

of wrongdoing by barbers at Strictly Skillz.  The DBPR Report asserts only one basis for

suspecting that Strictly Skillz was the site of unlawful activity.  Specifically, on two occasions in

**2007**—three years before the August 21, 2010 sweep operation—Inspector Demosthene

conducted a routine inspection of the barbershop and reported seeing several barbers operating

without a barbering license.  *See* DBPR Report, pp. 18–19.[11]  She reported that the barbers

---

[11] Defendants Vidler and Leslie argue that the DBPR Report is inadmissible hearsay and,
therefore, cannot be used by the Court in ruling on the Motions for Summary Judgment.  *See*
Doc. 105, pp. 3–4; Doc. 107, pp. 3–4.  The Court disagrees and finds that the DBPR Report may
be admissible under the public records exception to the hearsay rule, if the proper predicate is

refused to produce their barbering licenses. *Id.* Clearly, brief observations of any unlicensed barbering that occurred in 2007 do not give rise to probable cause that would support the issuance of a warrant in 2010. In the absence of direct criminal suspicion, OCSO and DBPR representatives validly invoked their statutory authority to inspect Strictly Skillz to determine whether barbers were operating without a license. *See Bruce*, 498 F.3d at 1242. Because OCSO and DBPR representatives had *some suspicion* of unlicensed barbering based on Inspector Demosthene's encounters and DBPR inspections at other neighborhood barbershops, the administrative inspection was not invalid. *See id.*

Moreover, there is no evidence that OCSO and DBPR representatives had any reason to believe that Strictly Skillz was the site of any unlawful narcotics, gambling, or weapons activities prior to the sweep operation, other than the fact that other neighborhood barbershops had been suspected of engaging in these kinds of activities. *See* DBPR Report, p. 17. Indeed, the primary purpose behind OCSO's involvement in the sweep operation was not to investigate these activities, but rather to provide security to DBPR representatives and to make arrests for unlicensed barbering. *See id.* at 15–20, 23–24; Vidler Aff. ¶¶ 3–5; Ogden Aff. ¶¶ 6–7. These were valid justifications in light of the resistance, threats, and assaults that DBPR representatives had encountered and their inability to make arrests for violations of the Barbers' Act. *See* DBPR Report, pp. 15–20, 23–24. Thus, any suspicion of criminal activity at Strictly Skillz fell well short of the level of probable cause necessary to support the issuance of a warrant. Accordingly, under *Bruce*, OCSO and DBPR representatives were entitled to conduct a warrantless administrative inspection of Strictly Skillz for the purpose of investigating barbering violations.

---

established. *See* Fed. R. Evid. 803(8); *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir. 1989) (the public records exception "allows into evidence public reports that (1) set forth factual findings (2) made pursuant to authority granted by law (3) that the judge finds trustworthy.").

See *Bruce*, 498 F.3d at 1242; *Stogner*, 638 F. Supp. at 4 (holding that inspectors for the Kentucky Board of Barbering were entitled to conduct warrantless inspections of barbershops, including barbering booths, whether or not those booths were occupied).

        *c.*     *The administrative search was not appropriately limited in scope*

Although the Court has determined that OCSO and DBPR representatives were constitutionally permitted to conduct a warrantless administrative search, the Court must still decide whether the *scope and execution* of the search were reasonable. *See Bruce*, 498 F.3d at 1244. The Eleventh Circuit has explained that "administrative searches are an exception to the Fourth Amendment's warrant requirement, but they are not an exception to the Fourth Amendment's requirement for reasonableness." *Id.* at 1243. Thus, while "a statute authorizing administrative searches may be constitutional, actual searches conducted under that authority may not." *Id.* at 1244. "'To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it.'" *Id.* at 1248 (quoting *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir.1998)).

In *Bruce*, although the Eleventh Circuit held that the law enforcement officers were permitted to conduct a warrantless administrative inspection of the auto body repair shop, *see supra* Part III.A.2.b, that Court nonetheless held that there were genuine issues of material fact regarding the scope and execution of the search and seizure which precluded summary judgment. *Id.* at 1248. In so holding, the Court noted that the administrative search of the auto body repair shop was conducted by 20 officers over a period of eight hours. *Id.* at 1244. In addition, the law enforcement officers arrived at the shop in unmarked vehicles, surrounded the property and blocked the exits with their vehicles. *Id.* The officers had their firearms drawn, and searched and detained employees. *Id.* The *Bruce* Court also noted that the "inspection" of the shop was in

"marked contrast" to a previous administrative inspection of the shop, in which "two very polite gentlemen" entered the office, showed identification, asked for certain records, examined them briefly and left, all within approximately 15 minutes.  *Id.* at 1243.  The Court reasoned that "[t]his hardly seems to be what the Supreme Court had in mind in *Burger* when it held that the Constitution is not offended by statutes authorizing the regular, routine inspection of books and records required to be kept by auto salvagers.  A jury might find it hard to disagree with [an on-site witness'] conclusion that this conduct resembled a criminal raid more than an administrative inspection."  *Id.* at 1244 (internal citations omitted).  In distinguishing *Burger*, the *Bruce* Court explained that in that case, "[t]here were no guns drawn, no overwhelming display of force, and no detention, search or seizure of employees.  This is the sort of search that seems to deserve the label 'administrative inspection.'"  *Id.* at 1245.

The *Bruce* Court also rejected the law enforcement officers' argument that their use of force was justified because "chop shops" are "dangerous places."  *Id.* at 1246.  The Court pointed to the absence of evidence in the record that there was any reason to expect that force was required to conduct the administrative inspection.  *Id.* at 1245.  "If defendants had information supporting a reasonable expectation that their arrival at [the shop] needed to be a para-military operation, then we would be in a position now to evaluate the reasonableness of their conduct.  Absent some such showing, we are not."  *Id.* at 1246.  Accordingly, the Court reversed the district court's grant of summary judgment to the officers, explaining that "[t]he facts in this case, as alleged in [plaintiff's] complaint, supported by evidence in his affidavits and deposition transcripts submitted in opposition to the defendants' motions for summary judgment, taken in the light most favorable to him, are sufficient to raise genuine issues of material fact for

trial as to whether defendants' conduct violated his Fourth Amendment right to be free from unreasonable administrative search and seizure." *Id.* at 1248.

Similarly here, Plaintiffs have offered evidence which is sufficient to raise genuine issues of material fact as to whether the administrative search of Strictly Skillz was unreasonable in its scope and execution.  As in *Bruce*, there is evidence that officers had their firearms drawn, surrounded the property, blocked the exits with their vehicles, and searched and detained employees.  Plaintiffs testified that around eight to ten OCSO officers, some of whom were wearing masks and bulletproof vests and had their guns drawn, "rushed in like the SWAT team." Anderson Dep., p. 48–52; Durant Dep., p. 56, 64–65; Trammon Dep., p. 61, 85.  Plaintiff Trammon was immediately handcuffed, while Plaintiff Anderson was promptly handcuffed after presenting his driver's license and barbering license.  Trammon Dep., pp. 61–64; Anderson Dep., pp. 53–54, 56–59.  Plaintiff Durant was immediately forced to sit in a chair.  Durant Dep., pp. 56–58.  Officers handcuffed Plaintiff Berry after he walked in from the back of the shop and identified himself as the owner.  Berry Dep., p. 71.  The officers also forced all customers, with the exception of one, to leave the shop, and they blocked off the parking lot of the shopping center, so that cars and individuals could not exit or enter.  Berry Dep., p. 70; Anderson Dep., p. 55; Durant Dep. pp. 37–38, 58, 71, 102–03; Trammon Dep., p. 65.  OCSO officers opened and searched through the drawers at Plaintiffs' barbering stations and, without Inspector Fields, inspected a storage room in the back of the shop, where no barbering services were rendered. Berry Dep., pp. 73, 88–94, 100; Anderson Dep., pp. 65, 67–68; Durant Dep., pp. 59, 61, 97–98; Trammon Dep., pp. 77–79.  This "inspection" of Strictly Skillz was in marked contrast to previous administrative inspections, which had never involved law enforcement, let alone narcotics agents.  Berry Dep., p. 54; Durant Dep., p. 40.  As the Eleventh Circuit observed in

*Bruce*, "[n]one of this conduct is either routine or administrative.  It is the conduct of officers conducting a raid." *Bruce*, 498 F.3d at 1245.

Nor have Defendants provided any justification for the massive display of force utilized during the "inspection."   While there is some evidence that certain barbershops in the neighborhood had been the site of aggressive behavior toward DBPR inspectors, as well as illegal weapons and narcotics activity, there is simply *no* evidence that Strictly Skillz had been the location of any such activity.  *See* DBPR Report, pp. 17–20.  Rather, the evidence shows that barbers at Strictly Skillz may have refused to produce their barbering licenses to Inspector Demosthene on two occasions in 2007.  *Id.* at 18–19.  Such conduct, if it occurred, would hardly serve as a justification for sending eight to ten officers into Strictly Skillz, sealing the perimeter, forcing out all customers, handcuffing barbers, and searching the shop without a warrant.  *See Bruce*, 498 F.3d at 1245–46.

Therefore, on the record before it, the Court cannot conclude that the administrative inspection of Strictly Skillz was "as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it."  *Id.* at 1248; *see Gordon*, 687 F. Supp. 2d at 948–52 (denying defendants' motion to dismiss where the complaint alleged that law enforcement officers had conducted a warrantless, raid-style administrative inspection of plaintiffs' barbershop, including:  entering the barbershop wearing bulletproof vests and carrying firearms, blocking exits, questioning customers, handcuffing a plaintiff, and searching drawers).  The facts in this case, as alleged in the Amended Complaint and supported by evidence in the affidavits, deposition transcripts, and DBPR Report, taken in the light most favorable to Plaintiffs, are sufficient to raise genuine issues of material fact for trial as to whether the administrative

inspection violated Plaintiffs' Fourth Amendment right to be free from an unreasonable administrative search and seizure. *See Bruce*, 498 F.3d at 1248.

### d.    § 1983 causation link to Defendants Vidler and Leslie

Although the evidence is sufficient to show a violation of Plaintiffs' Fourth Amendment rights, the Court must still determine whether that violation can be linked to Defendants Vidler and Leslie. "[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation. . . . A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (internal citations omitted); *see also Lloyd v. Van Tassell*, 318 F. App'x 755, 760 (11th Cir. 2009) ("In order to prevail on the merits in a § 1983 action against a defendant in his individual capacity, the plaintiff generally must show that he was personally involved in acts or omissions that resulted in the constitutional deprivation.").

The Court finds that there is sufficient evidence of Defendants Vidler and Leslie's personal involvement in the constitutional deprivation here. It is clear that Defendant Vidler was intimately involved in, if not primarily responsible for, organizing and planning the inspection of Strictly Skillz. *See* DBPR Report, pp. 16–17, 21–24; Doc. 139; ¶ 1. This is sufficient evidence for a reasonable jury to conclude that he is responsible for any constitutional deprivation that resulted from the inspection, if such deprivation was the result of instructions, or lack thereof, given by him. Moreover, it is undisputed that Defendant Vidler was present during the inspection and that he directed deputies to detain Plaintiff Trammon. Vidler Aff. ¶¶ 8, 11. As to Defendant Leslie, it is undisputed that he participated in the inspection, including handcuffing Plaintiff Berry and patting him down. Leslie Aff. ¶¶ 4, 6. Therefore, Plaintiffs have adequately demonstrated a constitutional violation by Defendants Vidler and Leslie.

e.      *The law regarding the proper scope of administrative searches was clearly established*

Since the Court has determined that the evidence supports a finding of a constitutional violation by Defendants Vidler and Leslie, they are entitled to qualified immunity "only if the law regarding the proper scope of administrative searches was not clearly established at the time the search was conducted." *Bruce*, 498 F.3d at 1249 (citing *Harlow*, 457 U.S. at 818). In *Bruce*, after holding that the facts supported a finding of a Fourth Amendment violation by the law enforcement officers, the Court concluded that Supreme Court and Eleventh Circuit precedent had clearly established that an administrative search must be reasonable under the circumstances and may not exceed its limited scope. *Id.* at 1250. Accordingly, there can be no doubt that the law regarding the proper scope of administrative searches was clearly established at the time of the search of Strictly Skillz. As such, Defendants Vidler and Leslie are not entitled to qualified immunity on Plaintiffs' Fourth Amendment claim.

**B.      Claims Against Defendant Demings**

1.      *§ 1983 Claims*

Counts Two and Four of the Amended Complaint assert claims under 42 U.S.C. § 1983 against Defendant Demings in his official capacity for alleged violations of Plaintiffs' constitutional rights under the Fourteenth and Fourth Amendments, respectively. *See* Doc. 87, pp. 16, 21. Claims against a municipal officer in his official capacity are treated as claims against the entity itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In that respect, any plaintiff bringing a § 1983 claim against a municipality based on the acts of one of its officers must prove two things. First, the plaintiff must prove that there was a constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Second, the plaintiff must prove that

the injury was a result of a municipal policy or custom.   *Lewis v. City of W. Palm Beach,*

*Florida*, 561 F.3d 1288, 1293 (11th Cir. 2009).

### a.   Equal Protection Claim

The Court has already determined in Part III.A.1, *supra*, that Plaintiffs have failed to

establish a violation of their rights under the Equal Protection Clause of the Fourteenth

Amendment.   Accordingly, Plaintiffs cannot prevail on their Equal Protection claim against

Defendant Demings in his official capacity.

### b.   Fourth Amendment Claim

The Court has held in Part III.A.2, *supra*, that Plaintiffs have offered sufficient evidence

of a violation of their Fourth Amendment rights to survive a motion for summary judgment.

Therefore, to prevail on their Fourth Amendment claim against Defendant Demings in his

official capacity, Plaintiffs must show that:

> [the sheriff] failed to train adequately his officers in the proper conduct of an
> administrative search, and this failure reflects a deliberate indifference to the
> rights of persons with whom the police come into contact.   Deliberate indifference
> may be established by a pattern of constitutional violations, or even by a single
> decision under appropriate circumstances.   The Supreme Court has said that in
> light of the duties assigned to specific officers or employees [where] the need for
> more or different training is so obvious, and the inadequacy so likely to result in
> the violation of constitutional rights, then the policymakers of the city can
> reasonably be said to have been deliberately indifferent to the need.

*Bruce*, 498 F.3d at 1248–49 (internal citations and quotations omitted).

In *Bruce*, after holding that there were genuine issues of material fact as to whether the

law enforcement officers had conducted an unreasonable search and seizure, the Eleventh Circuit

stated that "[s]hould constitutional violations be found at trial in this case, [the defendant-

sheriff's] liability will depend upon whether he failed to train adequately his officers in the

proper execution of an administrative inspection, and whether this failure permitted or

encouraged his officers' unconstitutional conduct of the administrative inspection of [the

plaintiff's] Premises.  Whether [the defendant-sheriff] had such a policy is a question of fact."  *Id.* at 1249.  Accordingly, the *Bruce* Court reversed the district court's grant of summary judgment to the sheriff on the plaintiff's Fourth Amendment claim.  *Id.*

However, this case differs from *Bruce* in at least one significant respect.  In *Bruce*, the plaintiff introduced evidence, in the form of deposition testimony from several law enforcement officers, that the officers had not received training from OCSO relating to either the propriety or scope of administrative inspections.  *See id.* at 1249 n.34; *Bruce v. Beary*, No. 6:04-cv-1595, Doc. 81, pp. 8–10.  Here, Plaintiffs have offered no evidence of the OCSO officers' lack of training with respect to administrative inspections.  Defendant Demings has submitted the affidavit of Thomas Cockriel, Captain over the training division for OCSO, in which he details the training received by OCSO deputies.  *See* Doc. 104, Cockriel Aff.  Similarly, Plaintiffs have not presented evidence of a pattern of constitutional violations.  As a result, Plaintiffs cannot establish "deliberate indifference" by OCSO, which requires "some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

In addition, Plaintiffs have failed to show that "the need to train and supervise in the particular areas in issue was so obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for this single incident."  *Id.* at 1352.  In *Gold*, the Eleventh Circuit rejected the plaintiff's invocation of the "single incident" theory, pointing to Supreme Court caselaw which characterized the theory as "simply *hypothesizing* in a *narrow range of circumstances* that a plaintiff might succeed without showing a pattern of constitutional violations."  *Id.* (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)) (emphasis

27

added).  That "hypothetical example" of the need to train being so obvious as to not require prior constitutional violations was the use of deadly force where firearms are provided to police officers.  *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).  The Supreme Court has recently reaffirmed the "narrow range of *Canton*'s hypothesized single-incident liability."  *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011).  In light of the narrow circumstances in which single-incident liability may be a viable theory for showing deliberate indifference, this Court declines to invoke such a theory here.

In sum, Plaintiffs have failed to establish any genuine issues of material fact with respect to a failure by OCSO to train officers in the proper conduct of an administrative search. Therefore, Defendant Demings is entitled to summary judgment on Plaintiffs' Fourth Amendment claim.

### 2.   *Injunctive Relief*

In Count Ten, Plaintiffs request a permanent injunction prohibiting Defendant Demings, in his official capacity as Sheriff, from racial profiling and conducting illegal and warrantless searches and seizures.[12]  Doc. 87, p. 29.  "An injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005) (internal citations and quotations omitted).  Thus, to obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if

---

[12] The Amended Complaint also requested a *preliminary* injunction on these grounds.  Doc. 87, p. 29.  However, at the hearing on Defendants' motions to dismiss, the Court ruled that this request had been waived because Plaintiffs had not filed a motion for preliminary injunction. *See* Doc. 118.

the court does not order injunctive relief.  *Id.* at 1128.  The Court has already held in Part III.B.1, *supra*, that Defendant Demings is entitled to summary judgment on Plaintiffs' Fourth Amendment and Equal Protection claims.  Because Plaintiffs have not prevailed in establishing a violation of their constitutional rights by Defendant Demings in his official capacity, they may not obtain injunctive relief.

## IV.    CONCLUSION

Following the Court's entry of this Order, the only claims remaining in this action will be:  (1) Count Three against Defendants Vidler and Leslie in their individual capacities; and (2) Counts Seven, Eight, and Nine against Defendant Demings in his official capacity.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.     Defendant Dave Ogden's Motion for Summary Judgment (Doc. 93) is **GRANTED**, as no genuine issues of material fact exist and he is entitled to entry of a judgment in his favor as a matter of law.

2.     Defendant Keith Vidler's Motion for Summary Judgment (Doc. 94) is **GRANTED in part** and **DENIED in part**:

   a.     As no genuine issues of material fact exist, Defendant Vidler's Motion for Summary Judgment is **GRANTED** as to Count One of the Amended Complaint.

   b.     In all other respects, Defendant Vidler's Motion for Summary Judgment is **DENIED**.

3.     Defendant Travis Leslie's Motion for Summary Judgment (Doc. 95) is **GRANTED in part** and **DENIED in part**:

      a.      As no genuine issues of material fact exist, Defendant Leslie's Motion for Summary Judgment is **GRANTED** as to Count One of the Amended Complaint.

      b.      In all other respects, Defendant Leslie's Motion for Summary Judgment is **DENIED**.

4.      As no genuine issues of material fact exist, Defendant Jerry Demings' Motion for Summary Judgment (Doc. 96) is **GRANTED**.

5.      The Clerk is **DIRECTED** to **terminate** Defendant Dave Ogden as a party to this case.

6.      A summary final judgment will be entered at the conclusion of this litigation.

**DONE** and **ORDERED** in Orlando, Florida on August 22, 2013.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties