[PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE ELEVENTH CIRCUIT
_____

No. 13-14092
_____

D.C. Docket No. 6:11-cv-01740-CEH-KRS

BRIAN BERRY,
JERMARIO ANDERSON,
REGINALD TRAMMON,
EDWYN DURANT,

Plaintiffs-Appellees,

versus

TRAVIS LESLIE,
Deputy,
KEITH VIDLER,
Corporal, in his individual Capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 16, 2014)

Before WILSON, WILLIAM PRYOR and ROSENBAUM, Circuit Judges.

ROSENBAUM, Circuit Judge:

It was a scene right out of a Hollywood movie.  On August 21, 2010, after more than a month of planning, teams from the Orange County Sheriff's Office descended on multiple target locations.  They blocked the entrances and exits to the parking lots so no one could leave and no one could enter.  With some team members dressed in ballistic vests and masks, and with guns drawn, the deputies rushed into their target destinations, handcuffed the stunned occupants—and demanded to see their barbers' licenses.  The Orange County Sheriff's Office was providing muscle for the Florida Department of Business and Professional Regulation's administrative inspection of barbershops to discover licensing violations.

We first held nineteen years ago that conducting a run-of-the-mill administrative inspection as though it is a criminal raid, when no indication exists that safety will be threatened by the inspection, violates clearly established Fourth Amendment rights.  *See Swint v. City of Wadley*, 51 F.3d 988 (11th Cir. 1995). We reaffirmed that principle in 2007 when we held that other deputies of the very same Orange County Sheriff's Office who participated in a similar warrantless criminal raid under the guise of executing an administrative inspection were not entitled to qualified immunity.  *See Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007).  Today,

we repeat that same message once again.  We hope that the third time will be the charm.

## I.

The instant case arises from an unannounced, warrantless inspection of a barbershop by officers of the Orange County Sheriff's Office ("OCSO") and representatives from the Florida Department of Business and Professional Regulation ("DBPR").  On August 21, 2010, OCSO and the DBPR conducted planned sweeps of several barbershops, located in predominantly Hispanic and African-American neighborhoods, with the purported intent of discovering violations of state licensing laws.

Plaintiff-Appellee Brian Berry is the sole owner of Strictly Skillz Barbershop, one of the targets of the operation.  Berry is a licensed barber and has been operating Strictly Skillz since 2007.  Plaintiffs-Appellees Edwyn Durant, Reginald Trammon, and Jermario Anderson are licensed barbers who rent barbering chairs at Strictly Skillz for a weekly rental fee.  All four plaintiffs, who were subject to OCSO and the DBPR's "administrative inspection" of Strictly Skillz, sued several OCSO officers, including Appellants Corporal Keith Vidler and Deputy Travis Leslie, alleging that the officers violated their Fourth Amendment rights to be free from unreasonable searches and seizures.

## II.

The DBPR is tasked with regulating and enforcing statutes and rules associated with professional licenses.  Barbershops are subject to this regulatory framework and are governed by § 476.184, Fla. Stat., and its implementing rules. Under the rules, DBPR inspectors are authorized to conduct biennial inspections to ensure that barbershops are in compliance with state licensing and sanitation laws. But the DBPR is not empowered to take law-enforcement action and must rely on local law enforcement to address violations of state law.

The impetus for the sting operation stemmed from a chance encounter between DBPR inspector Amanda Fields and Corporal Vidler, during which Fields complained of some of the difficulties that she had encountered in conducting her barbershop inspections.  Upon discovering that barbering without a license is a second-degree misdemeanor under Florida law, *see* Fla. Stat. § 476.194,[1]  Vidler

---

[1] Section 476.194, Fla. Stat., provides,

> (1) It is unlawful for any person to:
>
>> (a) Engage in the practice of barbering without an active license as a barber issued pursuant to the provisions of this act by the department.
>>
>> (b) Hire or employ any person to engage in the practice of barbering unless such person holds a valid license as a barber.
>>
>> (c) Obtain or attempt to obtain a license for money other than the required fee or any other thing of value or by fraudulent misrepresentations.

became intrigued by the possibility of a collaboration between the DBPR and OCSO and spent over a month, together with other OCSO officers and DBPR representatives, developing a plan for a joint sweep operation of various barbershops and salons.  The barbershops chosen for the operation were apparently selected because they or barbers within them had on previous occasions failed to cooperate with DBPR inspectors.[2]   All of the targeted barbershops were businesses that serviced primarily African-American and Hispanic clientele.

Vidler prepared the OCSO Operations Plan, which provided that the sweeps would be executed by two teams, each consisting of a supervisor, a narcotics agent, a plain-clothes deputy, three uniformed deputies, and two DBPR agents.  Although the stated goal of the operation was "to assist the DBPR in the detention and

---

> (d) Own, operate, maintain, open, establish, conduct, or have charge of, either alone or with another person or persons, a barbershop:
>
> > 1. Which is not licensed under the provisions of this chapter; or
> >
> > 2. In which a person not licensed as a barber is permitted to perform services.
>
> (e) Use or attempt to use a license to practice barbering when said license is suspended or revoked.
>
> (2) Any person who violates any provision of this section is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

[2] Strictly Skillz was included on this list because during two routine inspections in 2007, a DBPR inspector reported that barbers had refused to produce their licenses when asked to do so.  It is not clear from the record whether these incidents occurred before or after Berry purchased the business.

identification of unlicensed barbers and hair stylist[s]," the plan also contemplated other law-enforcement objectives. For example, the plan provided that any contraband discovered during the inspection had to be turned over to OCSO for prosecution and that the officers, with the assistance of narcotics agents, would identify and handle any narcotics, gather intelligence, and interview potential confidential informants.

On August 19, 2010, two days before the sweep, Inspector Fields and another DBPR inspector conducted walkthroughs of six of the target locations, including Strictly Skillz. Though the purpose of the walkthrough was to gather information for the operation, the inspectors did so under the guise of performing a routine inspection, verifying that the barbers' licenses were current and valid and inspecting the barbers' workstations. During the inspection of Strictly Skillz, the barbers were cooperative, no violations were found, and no citations were issued. Inspector Fields even commended Berry on the tremendous progress he had made in the shop.

Despite the fact that just two days earlier Strictly Skillz had passed inspection without any problems whatsoever and that the DBPR is permitted to conduct inspections only once every two years, on August 21, 2010, OCSO and the DBPR conducted a second inspection as part of the sting operation. The record, viewed in the light most favorable to the plaintiffs, reveals that the sweep of

Strictly Skillz occurred as follows:  Two plain clothes officers initially entered the barbershop to observe any potential violations.  Five or six barbers were on duty at the time, and the shop was filled with anywhere from ten to twenty-five waiting customers.  As the first day of the school year was approaching, several of the customers in the shop were children.

Shortly after the arrival of the plain-clothes officers, a "whole bunch" of police cars pulled into the shopping plaza and completely blocked off the parking lot, preventing all ingress and egress.  Officers then "rushed into" Strictly Skillz "like [a] SWAT team."  Based on the plaintiffs' collective recollection, it appears that somewhere between eight and ten officers, including narcotics agents, descended upon the barbershop, along with a DBPR inspector.  Some of the officers donned masks and bulletproof vests and had their guns drawn.  The officers immediately ordered all of the customers to exit the shop and announced that the shop was "closed down indefinitely."

Plaintiffs Trammon, Anderson, and Durant were in the barbershop when the officers stormed in.  The officers directed Anderson and Durant to present their driver's licenses for identification, and Inspector Fields instructed Anderson to retrieve his barbering license from his work station.  Trammon and Anderson, who were in the process of cutting customers' hair, were then immediately patted down and handcuffed with plastic zip ties.  Anderson was handcuffed by a masked

officer, and Trammon was restrained by two deputies who were not wearing masks. Sometime after Trammon was handcuffed, he informed the officers that he was in possession of a concealed firearm for which he had a valid concealed-weapons permit. The officers patted him down to retrieve the weapon and located the permit without incident.

Vidler, who was the supervisor on the scene, admits that he ordered deputies to detain Trammon. When Trammon argued to one of the officers that he had done nothing wrong, the officer responded, "It's a pretty big book, I'm pretty sure I can find something in here to take you to jail for." Durant, though told to "sit down and shut up," was not handcuffed and was eventually permitted to leave the shop.

Shortly thereafter, Berry, who had been behind the shop in the parking lot when the officers initially entered, walked into Strictly Skillz through the back entrance. Upon seeing that Trammon and Anderson were in handcuffs and being patted down by officers, Berry made his way to the front of the shop, identified himself as the owner, and demanded to know what was going on and why Trammon and Anderson were in handcuffs. Deputy Leslie then immediately placed Berry into metal handcuffs and patted him down. Though angry, Berry did not physically resist and complied with the officers' instructions.

While Trammon, Anderson, and Berry were restrained, Inspector Fields and the OCSO officers conducted their "inspection" of the barbershop. OCSO officers

8

called in the barbers' driver's license information to ascertain whether any of them had outstanding warrants, and Inspector Fields, for the second time in two days, checked the barbering licenses to ensure that they were still valid and current.  The officers, along with Inspector Fields, then searched the premises by inspecting each of the barbers' workstations and looking through their drawers.  OCSO officers also went to the back of the shop without Inspector Fields and searched through an unlocked storage room where no barbering services were rendered.

At the conclusion of the inspection, it was determined that all of the barbers had valid licenses and that the barbershop was in compliance with all safety and sanitation rules.  No criminal violations were discovered, and Berry, Anderson, and Trammon were released from their handcuffs.  The entire inspection lasted approximately one hour.  After the officers and Inspector Fields left, the barbershop resumed operations.[3]

### III.

Following the search of Strictly Skillz, the plaintiffs filed the present suit against a number of the officers involved, including Vidler and Leslie, alleging, among other things, that the barbershop inspection constituted an unlawful search in violation of the plaintiffs' Fourth Amendment rights.  Vidler and Leslie each moved for summary judgment on qualified-immunity grounds.  The district court

---

[3] After the August 21 sweep, OCSO and the DBPR conducted a second barbershop sting on September 17, 2010, targeting two barbershops and a hair and nail salon.

denied summary judgment as to the plaintiffs' Fourth Amendment claims, finding that although OCSO and the DBPR validly invoked their statutory authority to inspect Strictly Skillz to determine whether barbers were operating without a license, the law regarding administrative searches was clearly established, and a genuine issue of material fact existed as to whether the administrative search was appropriately limited in scope.  The district court also found that the plaintiffs had sufficiently established a causal link between the officers' involvement and the alleged constitutional violations.   Vidler and Leslie now appeal the denial of qualified immunity.

## IV.

We review *de novo* a district court's denial of summary judgment based on qualified immunity, applying the same legal standards that governed the district court.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (citing *Edwards v. Shanley*, 666 F.3d 1289, 1292 (11th Cir. 2012)).   Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). In making this determination, the Court must view the facts and make all reasonable inferences in the light most favorable to the non-moving party. *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir.

2004) (citing *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996)).  Thus, we accept the plaintiffs' version of the facts, as supported by evidence in the record.

## V.

The sole question that we address on this appeal is whether the district court correctly concluded that Vidler and Leslie are not entitled to qualified immunity on summary judgment.  Qualified immunity protects government officials performing discretionary functions from liability "unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted).  This doctrine protects "all but the plainly incompetent or one who is knowingly violating the federal law."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).

To obtain qualified immunity, a defendant must first demonstrate that he was acting within his discretionary authority when the alleged violation occurred. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).  Here, the parties do not dispute that Vidler and Leslie were acting within the scope of their discretionary duties.

Therefore, the burden shifts to the plaintiffs "'to show that the grant of qualified immunity is inappropriate.'"  *Id.* (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009)).  To do this, the plaintiffs must establish both

11

that a violation of their constitutional rights occurred and that the violated rights were "clearly established" at the time of the incident in question. *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013) (per curiam) (citing *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). The plaintiffs must also show a causal nexus between the defendants' acts or omissions and the alleged constitutional violations. *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citing *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982)). As explained below, we find that the district court did not err in concluding that the plaintiffs satisfied all of these showings.

## A.

Berry, Anderson, Trammon, and Durant assert that Vidler and Leslie violated their Fourth Amendment rights by subjecting them to an unreasonable search and seizure. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Its protections apply to "commercial premises, as well as to private homes." *New York v. Burger*, 482 U.S. 691, 699, 107 S. Ct. 2636, 2642 (1987). In general, the Fourth Amendment requires a warrant supported by probable cause to effectuate a constitutional search. *See id.* at 702, 107 S. Ct. at 2643. Indeed, this Court has explained, "The basic premise of search and seizure doctrine is that searches undertaken without a

12

warrant issued upon probable cause are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Swint v. City of Wadley*, 51 F.3d 988, 995 (11th Cir. 1995) (quoting *United States v. Alexander*, 835 F.2d 1406, 1408 (11th Cir. 1988)).

One of those limited exceptions involves administrative inspections of "closely regulated" industries. *See Burger*, 482 U.S. at 702, 107 S. Ct. at 2643. Because an owner or operator of commercial property "has a reduced expectation of privacy" in this context, the standard for what may be reasonable under the Fourth Amendment is correspondingly broader. *See id.* at 702−03, 107 S. Ct. at 2643–44.

To fall within this exception, a warrantless inspection must satisfy three criteria:  (1) "a 'substantial' government interest [must] inform[] the regulatory scheme pursuant to which the inspection is made," *id.* at 702, 107 S. Ct. at 2644; (2) the inspection "must be necessary to further [the] regulatory scheme," *id.* (alteration in original) (internal quotation marks omitted); and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant[,]"  *id.* at 703, 107 S. Ct. at 2644 (alterations in original) (internal quotation marks omitted).  The regulatory "statute must [also] be sufficiently comprehensive and defined" such that it "limits the discretion of inspecting officers." *United States v. Steed*, 548

13

F.3d 961, 968, 973 (11th Cir. 2008) (per curiam). "'Where a statute authorizes the inspection but makes no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply.'" *Bruce v. Beary*, 498 F.3d 1232, 1240 (quoting *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S. Ct. 774 (1970)).

But even when the criteria set forth above are met, to satisfy the Fourth Amendment, an administrative inspection must be "appropriately limited" in both scope and execution and may not serve as a backdoor for undertaking a warrantless search unsupported by probable cause. *Bruce*, 498 F.3d at 1239−40 (citations omitted). Above all, such inspections may never circumvent the Fourth Amendment's requirement for reasonableness. *See id.* at 1244 ("As with any search, then, the scope and execution of an administrative inspection must be reasonable in order to be constitutional."). In this regard, "an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Id.* at 1248 (citation and internal quotation marks omitted).

As detailed earlier, the regulatory framework for barbershop inspections in Florida is embodied in Fla. Stat. § 476.184 and its implementing rules. In particular, § 476.184 requires all barbershops to have a license issued by the DBPR

and directs the Florida Barbers' Board[4] to "adopt rules governing the operation and periodic inspection of barbershops licensed" in Florida.  Rule 61G3-19.015(1), Fla. Admin. Code, in turn, provides that the DBPR may conduct inspections biennially on a "random, unannounced basis."[5]  The regulatory framework, which sets forth who may conduct such inspections, notifies barbers that only the DBPR is so authorized.  *See Burger*, 482 U.S. at 711, 107 S. Ct. at 2648 (finding that the statute at issue in that case provided a "constitutionally adequate substitute for a warrant," in part because "it notifie[d] the operator as to who [was] authorized to conduct an inspection").  In this case, no one disputes that the DBPR possesses statutory authority to conduct warrantless inspections of barbershops, nor do the parties assert that the statute authorizing such inspections is constitutionally impermissible.

Instead, the plaintiffs contend that the search of Strictly Skillz, which they allege was undertaken with an inordinate display of force, failed to conform to the Fourth Amendment's requirement for reasonableness.  Because we have twice

---

[4] Section 476.184, Fla. Stat., authorizes the creation of the Barbers' Board within the Department of Business and Professional Regulation.

[5] Rule 61G3-19.015(1), Fla. Admin. Code, reads, in its entirety,

> Inspections conducted by the Department of Business and Professional Regulation of barbershops to determine whether such barbershops are in compliance with the applicable provisions of Chapter 476, [Fla. Stat.], and the rules promulgated thereunder shall be conducted biennially, effective July 1, 2010, on a random unannounced basis, unless otherwise practicable.

15

held, on facts disturbingly similar to those presented here, that a criminal raid executed under the guise of an administrative inspection is constitutionally unreasonable, we agree.

We first undertook this analysis in *Swint v. City of Wadley*, where we reviewed the constitutionality of two law-enforcement raids on a nightclub. The raids were executed with the aid of SWAT team members, several of the officers pointed their weapons at patrons, and the club patrons and employees were searched and detained for over an hour and a half. *Swint*, 51 F.3d at 993. Based on these facts, we rejected the officers' contention that the searches were valid administrative inspections, specifically noting that the "massive show of force and excessive intrusion" displayed during the raids far exceeded that of previous administrative inspections of the club. *Id.* at 999. We also emphasized that no reasonable officer in the defendants' position could have believed that the raids were lawful, administrative searches. *Id.*

More recently, in *Bruce v. Beary*, this Court again detailed the constitutionally permissible scope of administration inspections. *Bruce*, 498 F.3d at 1232. There, officers of the Orange County Sheriff's Office—the same organization involved in the barbershop sweeps—conducted a raid on an auto-body repair shop. *See id.* at 1236. The search involved a group of twenty officers who surrounded the premises and blocked all of the exits. *Id.* Some of the officers

16

were dressed in SWAT uniforms with ballistic vests.  *Id.*  The officers entered the shop with guns drawn, ordering all of the employees to line up along a fence.  *Id.*  Then the officers patted down and searched the employees.  *Id.*  Under these circumstances, we held that the search, which was more akin to a criminal raid than a routine inspection, exceeded the bounds of the Fourth Amendment.  *See id.* at 1245.  As the inspection of books and records "does not require exits to be blocked, an automatic shotgun to be stuck into an employee's back, employees to be lined up along a fence and patted down and deprived of their identification," we concluded that the search far surpassed its statutory authorization and was constitutionally unreasonable.  *Id.*

The facts of this case, which bear striking similarities to those described above, cannot escape the tight grasp of *Swint* and *Bruce*.  Unlike previous inspections of Strictly Skillz, which were all conducted by a single DBPR inspector without the aid of law enforcement, the August 21 search was executed with a tremendous and disproportionate show of force, and no evidence exists that such force was justified.  Despite the fact that neither OCSO nor the DBPR had any reason to believe that the inspection of Strictly Skillz posed a threat to officer safety, the record indicates that several OCSO officers entered the barbershop wearing masks and bulletproof vests, and with guns drawn; surrounded the building and blocked all of the exits; forced all of the children and other customers

to leave; announced that the business was "closed down indefinitely"; and handcuffed and conducted pat-down searches of the employees while the officers searched the premises.  Such a search, which bears no resemblance to a routine inspection for barbering licenses, is certainly not reasonable in scope and execution.  Rather, "[i]t is the conduct of officers conducting a raid."  *Bruce*, 498 F.3d at 1245.[6]

The show of force and search were all the more unreasonable in view of the fact that DBPR inspectors visited Strictly Skillz a mere two days before the search and had already determined that the barbershop and its employees were in compliance with state regulations.  Thus, the subsequent sting operation at Strictly Skillz, the very purpose of which was to check for licensing violations, was gratuitous at best.  Moreover, as the DBPR's implementing rules contemplate only biennial inspections, *see* Fla. Admin. Code 61G3-19.015, and no violation

---

[6]  To be clear, our basis for concluding that the search of Strictly Skillz was unconstitutional does not rest on the existence of any pretext on the part of OCSO and the DBPR.  Indeed, we have previously recognized that administrative searches are not rendered invalid because they are accompanied by some degree of suspicion, *see Bruce*, 498 F.3d at 1242, and the Supreme Court has similarly noted that suspicion of criminal activity will not defeat an otherwise permissible administrative search, *see United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3, 103 S. Ct. 2573, 2577 n.3 (1983)).  Accordingly, we do not consider whether the sting operation was pretextual; rather, our decision is based solely on our determination that the manner in which the so-called inspection was executed far exceeded the bounds of reasonableness under the Fourth Amendment.  *See Bruce*, 498 F.3d at 1250 (Carnes, J., concurring) ("There was a Fourth Amendment violation in this case because the scope of the law enforcement intrusion exceeded that which is permissible during an administrative search alone.  What happened in this case was more of a full scale raid and the kind of prolonged, top to bottom search that requires a warrant than it was an administrative search to determine compliance with laws applicable to a closely regulated business.").

warranting a follow-up inspection had occurred, the second inspection also exceeded the scope of the DBPR's statutory authority.

Not only that, but the statute authorizing administrative inspections of barbershops vests authority to conduct the inspections in the DBPR alone. *See* Fla. Stat. § 476.184; Fla. Admin. Code 61G3-19.015. While law enforcement is certainly permitted to accompany DBPR inspectors during their inspections to provide any needed assistance and to arrest individuals whom the DBPR's inspections determine to be in violation of the law, the administrative framework does not bestow upon police officers the authority to themselves conduct the barbershop inspections. Despite this fact, OCSO officers did exactly that and more; they themselves opened drawers in barbers' workstations and searched a storage closet in the back of Strictly Skillz.

Because the facts of this case—when viewed in the light most favorable to the plaintiffs—adequately establish that the "inspection" of Strictly Skillz amounted to an unconstitutional search and that the unconstitutionality of such a search was clearly established at the time that the search was executed, the plaintiffs have met their burden, and the district court properly determined that qualified immunity is inappropriate at this juncture.

**B.**

19

In affirming the denial of Vidler and Leslie's qualified-immunity defense, we do not depart from the long-standing principle that individual liability under § 1983 must be premised on each defendant's participation in the plaintiff's constitutional injury.  Indeed, it is well established that in order to prevail on a § 1983 claim, the plaintiff must demonstrate an "affirmative causal connection" between the official and the alleged deprivation.  *See Zatler*, 802 F.2d at 401. Moreover, we recognize that each defendant is entitled to an independent analysis of the applicability of the qualified-immunity doctrine to his actions.

To establish the requisite causal link, a plaintiff must show that the official was personally involved in the acts that resulted in the constitutional deprivation. *Zatler*, 802 F.2d at 401 (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 706 (11th Cir. 1985)).  "[T]he inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation."  *Williams*, 689 F.2d at 1381.  But this does not mean that a plaintiff must catalog each and every specific action in which a defendant engaged if that defendant was integrally involved in what was, from the outset, clearly an unreasonable search in violation of the plaintiff's Fourth Amendment rights.  *See Swint*, 51 F.3d at 994 (where the defendants "personally participated" in an

20

"inspection" conducted like a criminal raid, they were not entitled to qualified immunity).

Vidler and Leslie argue that the district court did not adequately identify their personal involvement in the plaintiffs' constitutional injuries for purposes of qualified immunity. We disagree.

The record clearly supports a finding that Vidler and Leslie were both active and full participants in the unconstitutional intrusion, which was unconstitutional from the moment that OCSO burst into Strictly Skillz in raid mode for the ostensible purpose of helping DBPR review Strictly Skillz's barbers' licenses that it had just inspected two days earlier. Vidler was the catalyst for the entire operation and was primarily responsible for its planning and organization. He was also present during the "inspection" and was the supervising officer on the scene. As for Leslie, it is undisputed that he placed one of the plaintiffs in handcuffs and helped to execute the unconstitutional search of the shop and barbering stations. These alleged acts sufficiently demonstrate both Vidler and Leslie's core participation in the warrantless search of Strictly Skillz and, if proven, violated the plaintiffs' Fourth Amendment right to be free from unreasonable searches.

Nor, as the dissent suggests, does declining to reverse the district court's denial of qualified immunity with respect to Trammon, Durant, and Anderson's claims against Leslie somehow "bend the law to resolve this appeal with a feel-

good ending from a box-office hit."  First, under the facts viewed in the light most favorable to the plaintiffs, the only "hit" that happened in this case was on Strictly Skillz.  Second, we highly doubt that the plaintiffs felt "good" when Vidler, Leslie, and the rest of the OCSO officers invaded their place of business with mask-and-bullet-proof-vest-donning officers with guns drawn, kicked their customers out on one of the busiest days of the year and advised customers that Strictly Skillz was "closed down indefinitely," and handcuffed the plaintiffs in the very spaces they rented.

And third, as for the law, we agree with our dissenting brother that judges should not "bend the law" to make it fit their personal views.  That is why we must affirm the district court's denial of qualified immunity to Officer Leslie with regard to the claims of Trammon, Durant, and Anderson.  Quite simply, binding precedent requires it.  Indeed, it is difficult to imagine a straighter application of binding precedent than *Swint* to the facts of this case.  In *Swint*, 30 to 40 officers conducted "raids" of a nightclub under the guise of performing "administrative searches."  51 F.3d at 993.  The plaintiffs in that case included Swint and Spradley, who owned the club; James, who was a club employee who was present during both raids; and Lewis, who was a club patron present only for the second raid. They sued three individual defendants:   Freddie Morgan, the police chief; Dendinger, a police officer; and James C. Morgan, the sheriff.

This Court described the raids at issue in that case as follows:

> [In the first raid,] **[t]***he Task Force officers* pointed their weapons at plaintiffs Spradley and James and others who were present. ***Participants in the raid*** searched the Club's cash register and door receipts, and some currency was confiscated from the door receipts. Persons inside the Club were prohibited from moving or leaving until the raid, which lasted one to one and one-half hours, was over. Those present were not allowed to go to the restroom. When ***one man*** asked for permission, [defendant] Officer Dendinger replied, "Shut up, or I'll shut you up myself." When plaintiff James told [defendant] Chief Morgan that she was so scared that she had to go to the restroom, he said no. . . .
>
> . . .
>
> During this second raid, ***law enforcement officials*** chambered rounds of ammunition into their weapons, pointed them, and ordered persons in the Club to get down on the floor. Some of those present in the Club during this raid were searched, including plaintiff Lewis. During the process of being searched, Lewis was pushed outside the Club, grabbed and shoved against a wall. After being searched, Lewis was forced to go back inside the Club until the raid was concluded. Another patron was pushed off a bar stool. Some of the employees, including plaintiff James, had guns held on them during the raid, which lasted from one to one and one-half hours. At one point, ***an officer***, with his finger on the trigger, pointed a shotgun at Lewis' face. . . .

*Id.* (emphasis added). Other than these facts, *Swint* states no specific facts about the roles of Officer Dendinger and Chief Morgan in the searches, except to note, "Chief Morgan and Officer Dendinger ***personally participated*** in both raids." *Id.* at 994 (emphasis added). Thus, nothing in the facts set forth in *Swint* identifies

23

what Dendinger did directly or particularly to any of the plaintiffs, other than that he told someone who was not a plaintiff to "shut up," thus showing only that Dendinger personally participated in the raids.  And, other than Chief Morgan's refusal to allow James to use the restroom, which also necessarily demonstrates Chief Morgan's personal participation in the raids, the opinion contains no indication that the plaintiffs identified anything specific that Chief Morgan did to them.

As for the opinion's description of the second raid—the only one for which plaintiff Lewis was even present—it does not even identify a particular action in which either Chief Morgan or Dendinger engaged at all.  Moreover, because the opinion describes the raids as occurring with 30 to 40 officers, we cannot infer from the facts set forth that Dendinger or Chief Morgan personally conducted the actual search or pushing of Lewis about which Lewis complained.

Nonetheless, and despite specifically acknowledging *Zatler*'s rule that § 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, this Court concluded in *Swint* that qualified immunity had to be denied to all three officers with respect to all four plaintiffs because, among other reasons, "[n]o reasonable officer in the defendants' position could have believed that these were lawful, warrantless administrative searches." *Id.* at 999.

24

Our dissenting colleague suggests that we are not bound by what *Swint* held when, because of the individual defendants' core personal participation in a warrantless search that was illegal from the outset, this Court denied qualified immunity to each of the individual defendants against each of the individual plaintiffs. By making this argument, the dissent effectively concedes that *Swint* did exactly what we are doing in this case. Only the dissent reasons that we are free to ignore what *Swint* did for three reasons.

First, the dissent asserts that "*Swint* did not consider at all the argument raised by Deputy Leslie in this appeal—whether an officer can be liable for violations of clearly established constitutional rights that he did not commit or that were not pursuant to a policy that he approved." Dissent at 5. But there is nothing new in this case that the Court in *Swint* did not consider.

The dissent's contention assumes that Deputy Leslie did not engage in violations of clearly established constitutional rights. But Leslie is not being denied qualified immunity for violations of clearly established constitutional rights that he did not commit or that were not pursuant to a policy that he approved. On the contrary, just like the defendant officers in *Swint*, Leslie is being held responsible for his core personal participation in what was, according to our binding precedent, clearly from the start, an unlawful, warrantless search that affected each and every one of the plaintiffs. Each of the plaintiff barbers had a

25

cognizable Fourth Amendment interest in the property that was illegally searched and a cognizable Fourth Amendment right not to have been seized by the raiding unit, under the circumstances. Just as Dendinger and Chief Morgan's "personal[] participat[ion]" in the illegal raids in *Swint* required the denial of qualified immunity for each of the defendants with regard to each of the plaintiffs, despite the absence of facts showing exactly what each officer did to each plaintiff whose rights were violated by the raids, Leslie's core participation in the illegal search of the plaintiffs' property and the unlawful detention of the plaintiffs violated each of the plaintiffs' clearly established rights and requires the denial of qualified immunity.

This reading of *Swint*'s requirements—that an officer's core "personal[] participation" in a warrantless search that is unlawful from its inception violates the clearly established rights of the people whose property was searched and who were seized, where the participating officers had clear notice from our prior case law that participation in a search of that particular type violates the Fourth Amendment—is the only reading of *Swint* that does not require us to ignore significant portions of the opinion. It also describes precisely the fact pattern that occurred in this case.

Second, the dissent attempts to distance itself from *Swint* and suggests that *Swint* does not compel the conclusion that qualified immunity must be denied to

Leslie with respect to the claims of Trammon, Durant, and Anderson because in *Swint*, this Court did not consider whether the *Swint* plaintiffs had established that each of the defendant officers had engaged in specific, identified actions with regard to each of the particular plaintiffs. *See* Dissent at 7-8. We respectfully disagree with the dissent.

In *Swint*, we expressly identified the requirement that a specific inquiry be made into the relationship between each defendant's actions and each plaintiff's alleged injuries. In this regard, we quoted *Zatler*'s requirement of "proof of an ***affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation*** . . . ." *Swint*, 498 F.3d at 999 (quoting *Zatler*, 802 F.2d at 401) (internal quotation marks omitted) (emphasis added). We further recognized in *Swint* that "it is clear that the inquiry into causation must be a ***directed one***, focusing on the duties and responsibilities of ***each of the individual defendants*** whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Swint*, 51 F.3d at 999 (quoting *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982)) (internal quotation marks omitted) (emphasis added). It would be strange, indeed, for us to have acknowledged these requirements and then not have actually considered them in our analysis. But to reach the dissent's conclusion, that is precisely what we would have had to have done.

Moreover, besides talking the talk, we walked the walk with regard to all three defendants. That is, we actually applied the *Zatler* causation requirements to all three defendants. The dissent seems to suggest that we considered only Sheriff Morgan's argument that the plaintiffs did not allege facts showing that he specifically violated their particular rights and that we did not consider that argument with respect to Dendinger or Chief Morgan. *See* Dissent at 7-8. But the opinion in *Swint* reflects that we specifically considered this very argument as it pertained to all three *Swint* defendants: Sheriff Morgan, Dendinger, and Chief Morgan.

With regard to Sheriff Morgan, we first described the sheriff's argument as follows: "According to the Sheriff, 'the *focus must center on the actions taken by [him]* and the information he possessed in taking those actions.'" *Id.* at 999 (emphasis added). We then explained that Sheriff Morgan's argument failed for two reasons. First, we said, "although § *1983 does require proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation*, '[p]ersonal participation . . . is only one of *several ways to establish the requisite causal connection*.'" *id.* (quoting *Zatler*, 802 F.2d at 401) (internal quotation marks omitted) (emphasis added). Put simply, we announced that we were considering whether *Zatler*'s causal-connection requirement was met. We reasoned that liability could be imposed on Sheriff

28

Morgan because a causal connection between his actions and the plaintiffs' constitutional deprivations existed, although he was present for neither raid, based on Sheriff Morgan's approval of an improper policy regarding the raids.

Second, we concluded that Sheriff Morgan's argument that the plaintiffs did not adequately demonstrate that he was responsible for their constitutional deprivations failed because "even if Sheriff Morgan had a reasonable basis for believing that his policies and training were adequate going into the first raid, that fails to explain why he authorized exactly the same conduct three months later in March of 1991, when he had reason to know better." *Id.*

As for Dendinger and Chief Morgan, significantly, the very next sentence and paragraph in the opinion start with the word "similarly" and then go on to apply the same logic just applied to Sheriff Morgan to Chief Morgan and Dendinger, demonstrating that we also specifically considered whether Chief Morgan and Dendinger should be denied qualified immunity where the record contained no allegations concerning their specific actions with respect to particular plaintiffs:

> ***Similarly, even if Chief Morgan and Officer Dendinger*** had not been fully aware of the Task Force's plan of attack before the first raid, as participants in the first raid they had ample opportunity to determine before the second raid was conducted whether the first had comported with constitutional requirements. ***Upon learning of the manner in which the first raid was conducted, reasonable law enforcement officials would***

> *have been on notice that clearly established Fourth Amendment rights had been violated.  Willingness to engage in the second raid demonstrated deliberate indifference to those rights, and it reflected accession to and adoption of the policies and procedures employed*.

*Id.* at 999-1000 (emphasis added).  In other words, we denied qualified immunity as to Lewis's claims against Chief Morgan and Officer Dendinger based on Chief Morgan and Officer Dendinger's mere personal participation in the second raid when they should have known that participation in such a warrantless search clearly violated the Fourth Amendment.  Thus, it is clear that we did, in fact, consider in *Swint* whether the general allegations concerning Chief Morgan and Dendinger's core "personal[] participat[ion]" in the warrantless searches satisfied *Zatler*'s requirement that a directed inquiry into the actions of the defendants with respect to the plaintiffs had been satisfied, and we concluded that it had.  As a result, *Swint* put Vidler and Leslie on notice that engaging in the type of warrantless search conducted in *Swint* clearly violates the Fourth Amendment.  Nor does the fact that the district court did not cite *Swint* in its opinion and the plaintiffs did not cite it in their appellate brief somehow make *Swint* any less binding precedent.

Finally, implicitly conceding that the raid in the instant case violated clearly established Fourth Amendment law, the dissent argues in its last attempt to resist the constraints of *Swint* that we

> conflate[] two distinct questions:  whether a search
> violates clearly established law, and who can sue whom
> on the basis of that violation.  The majority relies on
> *Swint*'s conclusion that the officers in *Swint* knew the
> planned raid violated "clearly established Fourth
> Amendment rights,"[7] to draw the unrelated conclusion
> that mere participation in such a raid is enough to expose
> any officer to liability to any plaintiff."

Dissent at 8.  The problem with this argument arises from the fact that it does not

acknowledge what we actually wrote in *Swint*.  In addition to holding that the

officers knew that the raids in *Swint* violated clearly established Fourth

Amendment rights, we found *Zatler*'s  requirement of a causal connection between

the defendants' actions and the plaintiffs' constitutional deprivation to have been

satisfied by the *Swint* defendants' personal participation in unlawfully searching

the club, in violation of the plaintiff owners' rights, and detaining the plaintiff

employee and plaintiff patron, in violation of their respective rights.

Indeed, we said as much when we concluded with respect to Dendinger and

Chief Morgan's personal participation in the second raid, "Upon learning of the

manner in which the first raid was conducted, reasonable law enforcement officials

would have been on notice that clearly established Fourth Amendment rights had

---

[7] Here, the dissent appears to acknowledge that *Swint* concluded that raids of the type conducted in that case and in this one violate clearly established Fourth Amendment rights, despite the dissent's suggestion to the contrary three sentences later.  *See* Dissent at 8 ("That is, the decision that the majority cites as clearly establishing what these individual officers should have known was never even mentioned by either the learned district judge or the plaintiffs' own counsel.").

been violated. Willingness to engage in the second raid demonstrated deliberate indifference to those rights . . . ." *Swint*, 51 F.3d at 999.  This passage is composed of two distinct thoughts:  the first sentence recognizes that the raids violated clearly established Fourth Amendment rights, while the second sentence takes the next step and, based on the *Swint* defendants' "deliberate indifference to [the *Swint* plaintiffs' clearly established Fourth Amendment] rights" by engaging in the raids despite their knowledge that the raids violated clearly established Fourth Amendment rights, finds a causal connection between the actions of the *Swint* defendants and the constitutional injuries of the *Swint* plaintiffs and attaches liability to the defendants against the *Swint* plaintiffs whose clearly established Fourth Amendment rights they violated.  Thus, neither the Court in *Swint* nor we conflate the clearly established requirement and the causal-connection requirement.

If the facts of this case differ in any material manner from those of *Swint*, it is only that they are even more compelling.  Whereas the *Swint* facts say nothing more with respect to the second raid than that Dendinger and Chief Morgan "personally participated" in it, here, the plaintiffs have alleged not only that both Vidler and Leslie "personally participated" in the search of Strictly Skillz, but that Vidler planned and supervised the raid, and Leslie participated in the search of the shop used by all of the plaintiffs to earn a living and then slapped handcuffs on Berry when he expressed displeasure with the treatment of the other plaintiffs.

As in *Swint*, "[n]o reasonable officer in the defendants' position could have believed that these were lawful, warrantless administrative searches." *See id.* at 999.   Where, as alleged here, officers participate in a search that was clearly established to be illegal from its inception, they are simply not entitled to qualified immunity any more than an officer who enters and searches a person's home without a warrant or an applicable warrant exception.   This is not a case where a group of officers entered a location to execute a validly obtained search warrant, and, without the approval of the other officers participating in the authorized search, one or two officers went off on an unconstitutional frolic of their own. Here, the entire search itself was unlawful from the beginning, and Vidler and Leslie, who fully participated in it, could reasonably be found to have violated the rights of all of the barbers searched and all of the barbers with a Fourth Amendment interest in Strictly Skillz's space, regardless of what each officer did one on one to each particular plaintiff barber.

Each officer's discrete actions in what was clearly an unlawful search from the outset are not the focus of our inquiry here.   Rather, the conduct under scrutiny is the officers' core participation in the warrantless search itself.[8]   Vidler and

---

[8] Several of our sister circuits have similarly held that personal participation in an unconstitutional search is sufficient to establish liability.  *See, e.g.*, *James by James v. Sadler*, 909 F.2d 834, 837–38 (5th Cir. 1990) ("[A]ll defendants' participation in the search and detention would be sufficient to impose liability under § 1983."); *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) ("[The officer] was a full, active participant in the search, not a mere

Leslie were not alleged to have engaged in segregable conduct outside of the clearly unlawful search that was otherwise occurring while they happened to be present and engaging in lawful activity.   Instead, Vidler and Leslie were entrenched participants in the warrantless search, which, from the start, violated the Fourth Amendment.

It has long been clearly established that a warrantless administrative inspection must be narrowly tailored to the administrative need that justifies it. Here—where the authorized purpose of the inspection was simply to check for barbering licenses and sanitation violations, and there is no indication that the defendants had any reason to believe that the inspection would be met with violence—the manner in which the supposed inspection of Strictly Skillz was undertaken was unreasonable from its inception and was, in fact, a search.   Our cases and those of the Supreme Court have long and repeatedly put officers on notice of these facts.   Because, under the facts alleged by the plaintiffs in this case, Vidler and Leslie were active participants in the unconstitutional search of Strictly

---

bystander. . . . Because the jury could properly have found that the search was unconstitutional, it was also justified in finding both officers liable for their integral participation in the violation."); *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009) ("[T]he 'integral participant' rule . . . extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves."); *Russo v. Massullo*, 927 F.2d 605 (6th Cir. 1991) (per curiam) ("The defendants attempt to evade liability by pointing to each other.  However, their arguments are unpersuasive in light of cases holding that all members of the team are liable where there is a team effort or where the members were an integral part of an unlawful search and seizure.").

Skillz, a jury could find them liable for the plaintiffs' resulting constitutional injuries.   We therefore **AFFIRM** the order below.

WILLIAM PRYOR, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion that the search of the barbershop exceeded the scope of a reasonable administrative inspection and that the barbers presented evidence that Corporal Keith Vidler, as the supervisor, violated their clearly established constitutional rights. I also agree that Brian Berry presented evidence that Deputy Travis Leslie, who handcuffed Berry and patted him down, violated his clearly established constitutional rights. But Edwyn Durant, Reginald Trammon, and Jermario Anderson presented no evidence that Deputy Travis Leslie violated their constitutional rights. Even though the inspection of the barbershop appeared to be "a scene right out of a Hollywood movie" (Majority Op. at 1), we cannot bend the law to resolve this appeal with a feel-good ending from a box-office hit. The law entitles Leslie to qualified immunity against any barber who failed to present evidence that Leslie personally deprived him of a clearly established constitutional right. Durant, Trammon, and Anderson failed to prove an affirmative causal connection between their specific injuries and Leslie's conduct. For that reason, I respectfully concur in part and dissent in part.

I agree with the majority that, to establish "an 'affirmative causal connection' between the official and the alleged deprivation," the barbers "must show that the official was personally involved in the acts that resulted in the constitutional deprivation." (Majority Op. at 20 (quoting *Zatler v. Wainwright*, 802

36

F.2d 397, 401 (11th Cir. 1986)).) And counsel for the barbers acknowledged at oral argument that our precedents "require" us to compare "each officer's actions" to the injury suffered by "each individual plaintiff." But, after reciting the correct governing law, the majority fails to consider whether *each* barber proved a causal connection between his specific injury and Deputy Leslie's conduct.

Durant, Trammon, and Anderson failed to present evidence that Leslie personally violated their constitutional rights. Durant testified that a male deputy wearing a uniform searched his workstation and ordered him to sit down, but he failed to identify that male deputy as Leslie. Although Leslie wore a uniform, more than one uniformed, male deputy participated in the search. Trammon testified that two female deputies handcuffed and searched him. Trammon also testified that a female inspector and another officer searched his workstation, but he failed to identify the other officer as Leslie. And counsel for the barbers conceded at oral argument that "there is no evidence that [Leslie] did anything personally to . . . Tramm[on]." Finally, Anderson testified that a short, male deputy wearing a mask and bulletproof vest handcuffed him and searched his workstation. But Leslie was not wearing a bulletproof vest and was not wearing a mask. And, despite having seen Leslie handcuff Berry, none of the barbers testified that the officer who searched him was the same officer who handcuffed Berry.

The majority asserts that "[t]he record clearly supports a finding that" Leslie was an "active and full participant[] in the unconstitutional intrusion" because Leslie "placed [Brian Berry] in handcuffs and helped to execute the unconstitutional search of the shop and barbering stations," (*id.* at 21), but "the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation," *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 999 (11th Cir. 1995). We must recall that the barbers sued Leslie in his individual capacity for money damages. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736 (1982). To be sure, each barber suffered a violation of his constitutional rights, and each barber has a valid claim against any officer who participated in that barber's injury. But the other barbers cannot piggyback on the violation of Berry's constitutional rights to obtain damages from Leslie's pocket for violations caused by other officers. And Leslie's general "help[] . . . execut[ing]" the search, (Majority Op. at 21), is not sufficient to deprive him of qualified immunity, *see Zatler*, 802 F.2d at 401; *see also Rizzo v. Goode*, 423 U.S. 362, 371, 96 S. Ct. 598, 604 (1976) (dismissing a claim under section 1983 because the plaintiffs proved only that "[i]ndividual police officers not named as parties to the action were found to have violated the constitutional rights of particular individuals, only a few of whom were parties plaintiff" and thus

38

there was no "affirmative link" between the actual defendants and the plaintiffs) (emphasis omitted); *cf. Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010) ("Merely being present . . . at the scene is not enough."). Unlike Berry, Durant, Trammon, and Anderson failed to present any evidence that Deputy Leslie participated in any way in inflicting the constitutional injuries that they suffered.

The majority boasts that "it is difficult to imagine a straighter application of binding precedent than *Swint* to the facts of this case," but its reading of *Swint* is far from "a straight[] application of binding precedent." (Majority Op. at 22.) The majority points out that "nothing in the facts set forth in *Swint* identifies what [the officer] or [the police chief] did directly or particularly to any of the plaintiffs" and yet the *Swint* court ruled "that qualified immunity had to be denied to all three officers with respect to all four plaintiffs because, among other reasons, 'no reasonable officer in the defendants' position could have believed that these were lawful, warrantless administrative searches.'" (Majority Op. at 24–25 (quoting *Swint*, 51 F.3d at 999).) The majority construes this lack of discussion as a binding command not to engage in a particularized analysis of each plaintiff's injury and each defendant's conduct. According to that reading, the four plaintiffs in *Swint*, plus every other employee and patron, would have a valid claim against not only the police chief, sheriff, and officer, but also all "30 to 40 officers" who participated in the raid. (Majority Op. at 24.) But *Swint* holds nothing of the kind.

39

At the very least, the police chief in *Swint* was a supervisor who, like Vidler, could be liable for the violations of the plaintiffs' constitutional rights even without personally participating in the violations, so the court would have no reason to analyze his conduct as related to each plaintiff's injury. And we can only speculate why the court did not discuss the officer's role in each plaintiff's injury—perhaps the officer failed to raise the defense. Our decision in *Swint* did not consider at all the argument raised by Deputy Leslie in this appeal—whether an officer can be liable for violations of clearly established constitutional rights that he did not commit or that were not pursuant to a policy that he approved.

Let's be clear about what the majority reads *Swint* to require. Under the majority's reading, *every* officer at the scene of an invalid search is liable for *every* violation of *every* plaintiff's rights. Even those officers who do not so much as look in the direction of a plaintiff, or so much as breathe on a plaintiff's property, or have any supervisory responsibility over the offending officers, will nevertheless be liable to *every plaintiff* due to the officers' "mere personal participation" when they "should have known that participation in such a . . . search clearly violated the Fourth Amendment." (Majority Op. at 30.)  And so the majority holds Deputy Leslie is subject to liability, despite no record evidence that Leslie touched Durant, Trammon, or Anderson, no record evidence that Leslie touched any property belonging to Durant, Trammon, or Anderson, and no record

evidence that Leslie supervised any of the officers who searched or seized property of Durant, Trammon, and Anderson.

Let's be just as clear that this is not what *Swint* requires. *Swint* proceeded, in relevant part, by addressing only three arguments raised by the officers in that appeal. First, the "[d]efendants argued" that "the search . . . was pursuant to probable cause and exigent circumstances." 51 F.3d at 996 (alteration and internal quotation marks omitted). As to probable cause, the officers argued that both general information about the club and the "drug transactions that preceded each of the raids" provided probable cause for the search. *Id.* at 997. After recounting the police chief's and sheriff's testimony, we ruled that the general information about the club did not amount to arguable probable cause and that "[p]robable cause to arrest one suspect . . . did not give the officers *carte blanche* to seize everyone who happened to be in the Club when the two raids took place." *Id.* And we explained that "[w]e need not address defendants' exigent circumstances argument," because we had already concluded that the officers lacked probable cause and "it is well-settled that . . . warrantless searches and seizures require that both probable cause and exigent circumstances exist." *Id.* at 998 (alteration and internal quotation marks omitted). Second, the "[d]efendants argue[d]" that "the two raids were administrative searches of the Club to which the Club owners had previously consented." *Id.* We ruled that the facts "simply [did] not support an administrative

search theory" because the raids involved a "massive show of force and excessive intrusion," and "the officers did not simply search for violations of the liquor laws." *Id.* at 998–99. Third, "*Sheriff Morgan* advance[d] another argument on the question of . . . whether he engaged in conduct violative of the rights established by clearly-established law." *Id.* at 999 (emphasis added) (alteration and internal quotation marks omitted). As to this argument raised only by the sheriff, we explained that, "although § 1983 does require proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, personal participation is only one of several ways to establish the requisite causal connection." *Id.* (alterations and internal quotation marks omitted). We explained that we also may impose liability "due to the existence of an improper policy." *Id.* (internal quotation mark omitted). We then considered the information known to the sheriff and ruled that he had authorized an improper policy. *Id.*

To be sure, *Swint* clearly established that the information known to the officers about the club does not amount to arguable probable cause for a raid; that a single drug transaction does not amount to arguable probable cause to search an entire establishment; that massive shows of force amount to unreasonable administrative inspections; and that owners and patrons can establish an affirmative causal connection between the violations of their constitutional rights

42

and a supervisor, like the sheriff, if the supervisor approved a policy that allowed the violations. But *Swint* said nothing at all about—much less clearly established— whether *every* person present during an unreasonable search has a valid claim against *every* officer who participated in that search.

I part ways with the majority because it conflates two distinct questions: whether a search violates clearly established law, and who can sue whom on the basis of that violation. The majority relies on *Swint*'s conclusion that the officers in *Swint* knew the planned raid violated "clearly established Fourth Amendment rights," to draw the unrelated conclusion that mere participation in such a raid is enough to expose any officer to liability to any plaintiff. (Majority Op. at 30 (quoting *Swint*, 51 F.3d at 999–1000).) But the central issue in *Swint* was whether the officers would have been on notice that the raid violated clearly established Fourth Amendment rights. The answer to that question does not establish *whose* Fourth Amendment rights they violated. Perhaps for that reason, neither the district court in its order nor the barbers in their brief even cite to *Swint* at all. That is, the decision that the majority cites as clearly establishing what these individual officers should have known was never even mentioned by either the learned district judge or the plaintiffs' own counsel.

Because Durant, Trammon, and Anderson failed to prove a causal link between Deputy Leslie's conduct and their constitutional deprivations, I

respectfully concur in part and dissent in part. I would reverse the denial of

summary judgment for the claims brought by Anderson, Durant, and Trammon

against Leslie and render partial summary judgment in his favor.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 16, 2014

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 13-14092-BB
Case Style: Brian Berry, et al v. Travis Leslie, et al
District Court Docket No: 6:11-cv-01740-CEH-KRS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Carol R. Lewis, BB at (404) 335-6179.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs